# HICKS, DISTRICT ATTORNEY FOR COUNTY OF ORANGE, CALIFORNIA, ACTING ON BEHALF OF FEIOCK *v.* FEIOCK

No. 86–787.   Argued December 1, 1987—Decided April 27, 1988

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined.   O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 641.   KENNEDY, J., took no part in the consideration or decision of the case.

*Michael R. Capizzi* argued the cause for petitioner.   With him on the briefs was *Cecil Hicks, pro se.*

*Richard L. Schwartzberg* argued the cause and filed a brief for respondent.*

JUSTICE WHITE delivered the opinion of the Court.

A parent failed to comply with a valid court order to make child support payments, and defended against subsequent contempt charges by claiming that he was financially unable

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Lauber, Michael K. Kellogg,* and *Michael Jay Singer;* for the State of California by *John K. Van de Kamp,* Attorney General, *Steve White,* Chief Assistant Attorney General, and *Mark Alan Hart* and *Andrew D. Amerson,* Supervising Deputy Attorneys General; and for the Women's Legal Defense Fund et al. by *Carolyn F. Corwin* and *Susan Deller Ross.*

to make the required payments. The trial court ruled that under state law he is presumed to remain able to comply with the terms of the prior order, and judged him to be in contempt. The state appellate court held that the legislative presumptions applied by the trial court violate the Due Process Clause of the Fourteenth Amendment, which forbids a court to employ certain presumptions that affect the determination of guilt or innocence in criminal proceedings. We must decide whether the Due Process Clause was properly applied in this case.

I

On January 19, 1976, a California state court entered an order requiring respondent, Phillip Feiock, to begin making monthly payments to his ex-wife for the support of their three children. Over the next six years, respondent only sporadically complied with the order, and by December 1982 he had discontinued paying child support altogether. His ex-wife sought to enforce the support orders. On June 22, 1984, a hearing was held in California state court on her petition for ongoing support payments and for payment of the arrearage due her. The court examined respondent's financial situation and ordered him to begin paying $150 per month commencing on July 1, 1984. The court reserved jurisdiction over the matter for the purpose of determining the arrearages and reviewing respondent's financial condition.

Respondent apparently made two monthly payments but paid nothing for the next nine months. He was then served with an order to show cause why he should not be held in contempt on nine counts of failure to make the monthly payments ordered by the court. At a hearing on August 9, 1985, petitioner made out a prima facie case of contempt against respondent by establishing the existence of a valid court order, respondent's knowledge of the order, and respondent's failure to comply with the order. Respondent defended by arguing that he was unable to pay support during

the months in question. This argument was partially successful, but respondent was adjudged to be in contempt on five of the nine counts. He was sentenced to 5 days in jail on each count, to be served consecutively, for a total of 25 days. This sentence was suspended, however, and respondent was placed on probation for three years. As one of the conditions of his probation, he was ordered once again to make support payments of $150 per month. As another condition of his probation, he was ordered, starting the following month, to begin repaying $50 per month on his accumulated arrearage, which was determined to total $1,650.

At the hearing, respondent had objected to the application of Cal. Civ. Proc. Code Ann. § 1209.5 (West 1982) against him, claiming that it was unconstitutional under the Due Process Clause of the Fourteenth Amendment because it shifts to the defendant the burden of proving inability to comply with the order, which is an element of the crime of contempt.[1] This objection was rejected, and he renewed it on appeal. The intermediate state appellate court agreed with respondent and annulled the contempt order, ruling that the state statute purports to impose "a mandatory presumption compelling a conclusion of guilt without independent proof of an ability to pay," and is therefore unconstitutional because "the mandatory nature of the presumption lessens the prosecution's burden of proof." 180 Cal. App. 3d 649, 654, 225 Cal. Rptr. 748, 751 (1986).[2] In light of its holding that the statute as previously interpreted was unconstitutional, the

---

[1] California Civ. Proc. Code Ann. § 1209.5 (West 1982) states that "[w]hen a court of competent jurisdiction makes an order compelling a parent to furnish support . . . for his child, proof that . . . the parent was present in court at the time the order was pronounced and proof of noncompliance therewith shall be prima facie evidence of a contempt of court."

[2] Although the court mentioned one state case among the cases it cited in support of this proposition, the court clearly rested on federal constitutional grounds as articulated in this Court's decisions, 180 Cal. App. 3d, at 652–655, 225 Cal. Rptr., at 749–751, as did the other state case it cited. See *People* v. *Roder*, 33 Cal. 3d 491, 658 P. 2d 1302 (1983).

court went on to adopt a different interpretation of that statute to govern future proceedings: "For future guidance, however, we determine the statute in question should be construed as authorizing a permissive inference, but not a mandatory presumption." *Id.*, at 655, 225 Cal. Rptr., at 751. The court explicitly considered this reinterpretation of the statute to be an exercise of its "obligation to interpret the statute to preserve its constitutionality whenever possible." *Ibid.* The California Supreme Court denied review, but we granted certiorari. 480 U. S. 915 (1987).

## II

Three issues must be decided to resolve this case. First is whether the ability to comply with a court order constitutes an element of the offense of contempt or, instead, inability to comply is an affirmative defense to that charge. Second is whether § 1209.5 requires the alleged contemnor to shoulder the burden of persuasion or merely the burden of production in attempting to establish his inability to comply with the order. Third is whether this contempt proceeding was a criminal proceeding or a civil proceeding, *i. e.*, whether the relief imposed upon respondent was criminal or civil in nature.

Petitioner argues that the state appellate court erred in its determinations on the first two points of state law. The court ruled that whether the individual is able to comply with a court order is an element of the offense of contempt rather than an affirmative defense to the charge, and that § 1209.5 shifts to the alleged contemnor the burden of persuasion rather than simply the burden of production in showing inability to comply. We are not at liberty to depart from the state appellate court's resolution of these issues of state law. Although petitioner marshals a number of sources in support of the contention that the state appellate court misapplied state law on these two points, the California Supreme Court

denied review of this case, and we are not free in this situation to overturn the state court's conclusions of state law.[3]

The third issue, however, is a different matter: the argument is not merely that the state court misapplied state law, but that the characterization of this proceeding and the relief given as civil or criminal in nature, for purposes of determining the proper applicability of federal constitutional protections, raises a question of federal law rather than state law. This proposition is correct as stated. *In re Winship*, 397 U. S. 358, 365–366 (1970); *In re Gault*, 387 U. S. 1, 49–50 (1967); *Shillitani* v. *United States*, 384 U. S. 364, 368–369 (1966). The fact that this proceeding and the resultant relief were judged to be criminal in nature as a matter of state law is thus not determinative of this issue, and the state appellate court erred insofar as it sustained respondent's challenge to the statute under the Due Process Clause simply because it concluded that this contempt proceeding is "quasi-criminal" as a matter of California law. 180 Cal. App. 3d, at 653, 225 Cal. Rptr., at 750.

---

[3] "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. . . . This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court. . . . Even though it is arguable that the Supreme Court of [the State] will at some later time modify the rule of [this] case, whether that will ever happen remains a matter of conjecture. In the meantime the state law applicable to these parties and in this case has been authoritatively declared by the highest state court in which a decision could be had. . . . We think that the law thus announced and applied is the law of the state applicable in the same case and to the same parties in the federal court and that the federal court is not free to apply a different rule however desirable it may believe it to be, and even though it may think that the state Supreme Court may establish a different rule in some future litigation." *West* v. *American Telephone & Telegraph Co.*, 311 U. S. 223, 237–238 (1940).

## III

## A

The question of how a court determines whether to classify the relief imposed in a given proceeding as civil or criminal in nature, for the purposes of applying the Due Process Clause and other provisions of the Constitution, is one of long standing, and its principles have been settled at least in their broad outlines for many decades. When a State's proceedings are involved, state law provides strong guidance about whether or not the State is exercising its authority "in a nonpunitive, noncriminal manner," and one who challenges the State's classification of the relief imposed as "civil" or "criminal" may be required to show "the clearest proof" that it is not correct as a matter of federal law. *Allen* v. *Illinois*, 478 U. S. 364, 368–369 (1986). Nonetheless, if such a challenge is substantiated, then the labels affixed either to the proceeding or to the relief imposed under state law are not controlling and will not be allowed to defeat the applicable protections of federal constitutional law. *Ibid.* This is particularly so in the codified laws of contempt, where the "civil" and "criminal" labels of the law have become increasingly blurred.[4]

Instead, the critical features are the substance of the proceeding and the character of the relief that the proceeding will afford. "If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 441 (1911). The character of the relief imposed is thus ascertainable by applying a few straightfor-

---

[4] California is a good example of this modern development, for although it defines civil and criminal contempts in separate statutes, compare Cal. Civ. Proc. Code Ann. § 1209 (West Supp. 1988) with Cal. Penal Code Ann. § 166 (West 1970), it has merged the two kinds of proceedings under the same procedural rules. See Cal. Civ. Proc. Code Ann. §§ 1209–1222 (West 1982 and Supp. 1988).

ward rules. If the relief provided is a sentence of imprisonment, it is remedial if "the defendant stands committed unless and until he performs the affirmative act required by the court's order," and is punitive if "the sentence is limited to imprisonment for a definite period." *Id.*, at 442. If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order. These distinctions lead up to the fundamental proposition that criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings, including the requirement that the offense be proved beyond a reasonable doubt. See, *e. g., Gompers, supra,* at 444; *Michaelson* v. *United States ex rel. Chicago, St. P., M. & O. R. Co.,* 266 U. S. 42, 66 (1924).[5]

The Court has consistently applied these principles. In *Gompers,* decided early in this century, three men were found guilty of contempt and were sentenced to serve 6, 9, and 12 months respectively. The Court found this relief to be criminal in nature because the sentence was determinate and unconditional. "The distinction between refusing to do an act commanded,—remedied by imprisonment until the party performs the required act; and doing an act forbidden,—punished by imprisonment for a definite term; is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment."

---

[5] We have recognized that certain specific constitutional protections, such as the right to trial by jury, are not applicable to those criminal contempts that can be classified as petty offenses, as is true of other petty crimes as well. *Bloom* v. *Illinois,* 391 U. S. 194, 208–210 (1968). This is not true, however, of the proposition that guilt must be proved beyond a reasonable doubt. *Id.*, at 205.

*Gompers*, 221 U. S., at 443. In the former instance, the conditional nature of the punishment renders the relief civil in nature because the contemnor "can end the sentence and discharge himself at any moment by doing what he had previously refused to do." *Id.*, at 442. In the latter instance, the unconditional nature of the punishment renders the relief criminal in nature because the relief "cannot undo or remedy what has been done nor afford any compensation" and the contemnor "cannot shorten the term by promising not to repeat the offense." *Ibid.*

The distinction between relief that is civil in nature and relief that is criminal in nature has been repeated and followed in many cases. An unconditional penalty is criminal in nature because it is "solely and exclusively punitive in character." *Penfield Co.* v. *SEC*, 330 U. S. 585, 593 (1947). A conditional penalty, by contrast, is civil because it is specifically designed to compel the doing of some act. "One who is fined, unless by a day certain he [does the act ordered], has it in his power to avoid any penalty. And those who are imprisoned until they obey the order, 'carry the keys of their prison in their own pockets.'" *Id.*, at 590, quoting *In re Nevitt*, 117 F. 448, 461 (CA8 1902). In *Penfield*, a man was found guilty of contempt for refusing to obey a court order to produce documents. This Court ruled that since the man was not tried in a proceeding that afforded him the applicable constitutional protections, he could be given a conditional term of imprisonment but could not be made to pay "a flat, unconditional fine of $50.00." *Penfield, supra*, at 588.[6] See

---

[6] In *Penfield*, the original court order required a person to produce certain documents. He refused to comply. The District Court then found him guilty of contempt and required him to pay a fine to the court, which he promptly paid. (The court had also ordered him to stand committed until he paid this fine.) The Court of Appeals reversed, finding that the District Court had erred in imposing this relief, which was criminal in nature, and ordered the man instead to stand committed to prison until he complied with the original order by producing the documents. This Court affirmed,

also *United States* v. *Rylander*, 460 U. S. 752 (1983); *Nye* v. *United States*, 313 U. S. 33 (1941); *Fox* v. *Capital Co.*, 299 U. S. 105 (1936); *Lamb* v. *Cramer*, 285 U. S. 217 (1932); *Oriel* v. *Russell*, 278 U. S. 358 (1929); *Ex parte Grossman*, 267 U. S. 87 (1925); *Doyle* v. *London Guarantee Co.*, 204 U. S. 599 (1907); *In re Christensen Engineering Co.*, 194 U. S. 458 (1904); *Bessette* v. *W. B. Conkey Co.*, 194 U. S. 324 (1904).

*Shillitani* v. *United States*, 384 U. S. 364 (1966), adheres to these same principles. There two men were adjudged guilty of contempt for refusing to obey a court order to testify under a grant of immunity. Both were sentenced to two years of imprisonment, with the proviso that if either answered the questions before his sentence ended, he would be released. The penalties were upheld because of their "conditional nature," even though the underlying proceeding lacked certain constitutional protections that are essential in criminal proceedings. *Id.*, at 365. Any sentence "must be viewed as remedial," and hence civil in nature, "if the court conditions release upon the contemnor's willingness to [comply with the order]." *Id.*, at 370. By the same token, in a civil proceeding the court "may also impose a determinate sentence *which includes a purge clause.*" *Id.*, at 370, n. 6 (emphasis added). "On the contrary, a criminal contempt proceeding would be characterized by the imposition of an

---

finding that this relief was civil in nature and was properly imposed, whereas the relief that had been ordered by the District Court was criminal in nature and had not been properly imposed. 330 U. S., at 587–595. The reason that the sanction imposed by the District Court was found to be criminal in nature is because it was determinate: the contemnor could not avoid the sanction by agreeing to comply with the original order to produce the documents. Yet the sanction of confinement imposed by the Court of Appeals was civil in nature because it was conditional, *i. e.,* not determinate: the contemnor would avoid the sanction by agreeing to comply with the original order to produce the documents.

unconditional sentence for punishment or deterrence." *Id.*, at 370, n. 5.[7]

## B

In repeatedly stating and following the rules set out above, the Court has eschewed any alternative formulation that would make the classification of the relief imposed in a State's proceedings turn simply on what their underlying purposes are perceived to be. Although the purposes that lie behind particular kinds of relief are germane to understanding their character, this Court has never undertaken to psychoanalyze the subjective intent of a State's laws and its courts, not only because that effort would be unseemly and improper, but also because it would be misguided. In contempt cases, both civil and criminal relief have aspects that can be seen as either remedial or punitive or both: when a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order. As was noted in *Gompers:*

"It is true that either form of [punishment] has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority. On the other hand, if the proceeding is for criminal contempt and the [punishment] is solely

---

[7] In these passages from *Shillitani*, the Court clearly indicated that when it spoke of a court's conditioning *release* upon the contemnor's willingness to comply, it did not mean simply release *from physical confinement,* but release from the imposition of any sentence that would otherwise be determinate. The critical feature that determines whether the remedy is civil or criminal in nature is not when or whether the contemnor is physically required to set foot in a jail but whether the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order. It follows that the remedy in this case is not rendered civil in nature merely by suspending respondent's sentence and placing him on probation (with its attendant disabilities, see n. 11, *infra*).

punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent a repetition of the disobedience. But such indirect consequences will not change [punishment] which is merely coercive and remedial, into that which is solely punitive in character, or *vice versa.*" 221 U. S., at 443.

For these reasons, this Court has judged that conclusions about the purposes for which relief is imposed are properly drawn from an examination of the character of the relief itself.

There is yet another reason why the overlapping purposes of civil and criminal contempt proceedings have prevented this Court from hinging the classification on this point. If the definition of these proceedings and their resultant relief as civil or criminal is made to depend on the federal courts' views about their underlying purposes, which indeed often are not clearly articulated in any event, then the States will be unable to ascertain with any degree of assurance how their proceedings will be understood as a matter of federal law. The consequences of any such shift in direction would be both serious and unfortunate. Of primary practical importance to the decision in this case is that the States should be given intelligible guidance about how, as a matter of federal constitutional law, they may lawfully employ presumptions and other procedures in their contempt proceedings. It is of great importance to the States that they be able to understand clearly and in advance the tools that are available to them in ensuring swift and certain compliance with valid court orders—not only orders commanding payment of child support, as in this case, but also orders that command compliance in the more general area of domestic relations law, and in all other areas of the law as well.

The States have long been able to plan their own procedures around the traditional distinction between civil and

criminal remedies. The abandonment of this clear dividing line in favor of a general assessment of the manifold and complex purposes that lie behind a court's action would create novel problems where now there are rarely any—novel problems that could infect many different areas of the law. And certainly the fact that a contemnor has his sentence suspended and is placed on probation cannot be decisive in defining the civil or criminal nature of the relief, for many convicted criminals are treated in exactly this manner for the purpose (among others) of influencing their behavior. What is true of the respondent in this case is also true of any such convicted criminal: as long as he meets the conditions of his informal probation, he will never enter the jail. Nonetheless, if the sentence is a determinate one, then the punishment is criminal in nature, and it may not be imposed unless federal constitutional protections are applied in the contempt proceeding.[8]

## IV

The proper classification of the relief imposed in respondent's contempt proceeding is dispositive of this case. As interpreted by the state court here, § 1209.5 requires respondent to carry the burden of persuasion on an element of the offense, by showing his inability to comply with the court's order to make the required payments. If applied in a criminal proceeding, such a statute would violate the Due Process Clause because it would undercut the State's burden to prove guilt beyond a reasonable doubt. See, *e. g.*, *Mullaney* v.

---

[8] This does not even suggest, of course, that the State is unable to suspend the sentence imposed on either a criminal contemnor or a civil contemnor in favor of a term of informal probation. That action may be appropriate and even most desirable in a great many cases, especially when the order that has been disobeyed was one to pay a sum of money. This also accords with the repeated emphasis in our decisions that in wielding its contempt powers, a court "must exercise 'the least possible power adequate to the end proposed.'" *Shillitani* v. *United States*, 384 U. S. 364, 371 (1966), quoting *Anderson* v. *Dunn*, 6 Wheat. 204, 231 (1821).

*Wilbur*, 421 U. S. 684, 701–702 (1975). If applied in a civil proceeding, however, this particular statute would be constitutionally valid, *Maggio* v. *Zeitz*, 333 U. S. 56, 75–76 (1948); *Oriel*, 278 U. S., at 364–365, and respondent conceded as much at the argument. Tr. of Oral Arg. 37.[9]

The state court found the contempt proceeding to be "quasi-criminal" in nature without discussing the point. 180 Cal. App. 3d, at 653, 225 Cal. Rptr., at 750. There were strong indications that the proceeding was intended to be criminal in nature, such as the notice sent to respondent, which clearly labeled the proceeding as "criminal in nature," Order to Show Cause and Declaration for Contempt (June 12, 1985), App. 21, and the participation of the District Attorney in the case. Though significant, these facts are not dispositive of the issue before us, for if the trial court had imposed only civil coercive remedies, as surely it was authorized to do, then it would be improper to invalidate that result merely because the Due Process Clause, as applied in *criminal* proceedings, was not satisfied.[10] It also bears emphasis that the purposes underlying this proceeding were wholly ambiguous. Respondent was charged with violating nine discrete prior court orders, and the proceeding may have been intended

---

[9] Our precedents are clear, however, that punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order. *United States* v. *Rylander*, 460 U. S. 752, 757 (1983); *Shillitani, supra*, at 371; *Oriel*, 278 U. S., at 366.

[10] This can also be seen by considering the notice given to the alleged contemnor. This Court has stated that one who is charged with a crime is "entitled to be informed of the nature of the charge against him but to know that it is a charge and not a suit." *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 446 (1911). Yet if the relief ultimately given in such a proceeding is wholly civil in nature, then this requirement would not be applicable. It is also true, of course, that if *both* civil and criminal relief are imposed in the same proceeding, then the "'criminal feature of the order is dominant and fixes its character for purposes of review.'" *Nye* v. *United States*, 313 U. S. 33, 42–43 (1941), quoting *Union Tool Co.* v. *Wilson*, 259 U. S. 107, 110 (1922).

primarily to vindicate the court's authority in the face of his defiance. On the other hand, as often is true when court orders are violated, these charges were part of an ongoing battle to force respondent to conform his conduct to the terms of those orders, and of future orders as well.

Applying the traditional rules for classifying the relief imposed in a given proceeding requires the further resolution of one factual question about the nature of the relief in this case. Respondent was charged with nine separate counts of contempt, and was convicted on five of those counts, all of which arose from his failure to comply with orders to make payments in past months. He was sentenced to 5 days in jail on each of the five counts, for a total of 25 days, but his jail sentence was suspended and he was placed on probation for three years. If this were all, then the relief afforded would be criminal in nature.[11] But this is not all. One of the conditions of respondent's probation was that he begin making payments on his accumulated arrearage, and that he continue making these payments at the rate of $50 per month. At that rate, all of the arrearage would be paid before respondent completed his probation period. Not only did the order therefore contemplate that respondent would be required to

---

[11] That a determinate sentence is suspended and the contemnor put on probation does not make the remedy civil in nature, for a suspended sentence, without more, remains a determinate sentence, and a fixed term of probation is itself a punishment that is criminal in nature. A suspended sentence with a term of probation is not equivalent to a conditional sentence that would allow the contemnor to avoid or purge these sanctions. A determinate term of probation puts the contemnor under numerous disabilities that he cannot escape by complying with the dictates of the prior orders, such as: any conditions of probation that the court judges to be reasonable and necessary may be imposed; the term of probation may be revoked and the original sentence (including incarceration) may be reimposed at any time for a variety of reasons without all the safeguards that are ordinarily afforded in criminal proceedings; and the contemnor's probationary status could affect other proceedings against him that may arise in the future (for example, this fact might influence the sentencing determination made in a criminal prosecution for some wholly independent offense).

purge himself of his past violations, but it expressly states that "[i]f any two payments are missed, whether consecutive or not, the entire balance shall become due and payable." Order of the California Superior Court for Orange County (Aug. 9, 1985), App. 39. What is unclear is whether the ultimate satisfaction of these accumulated prior payments would have purged the determinate sentence imposed on respondent. Since this aspect of the proceeding will vary as a factual matter from one case to another, depending on the precise disposition entered by the trial court, and since the trial court did not specify this aspect of its disposition in this case, it is not surprising that neither party was able to offer a satisfactory explanation of this point at argument. Tr. of Oral Arg. 42–47.[12] If the relief imposed here is in fact a determinate sentence with a purge clause, then it is civil in nature. *Shillitani,* 384 U. S., at 370, n. 6; *Fox,* 299 U. S., at 106, 108; *Gompers,* 221 U. S., at 442.

The state court did not pass on this issue because of its erroneous view that it was enough simply to aver that this proceeding is considered "quasi-criminal" as a matter of state law. And, as noted earlier, the court's view on this point, coupled with its view of the Federal Constitution, also led it to reinterpret the state statute, thus softening the impact of the presumption, in order to save its constitutionality. Yet the Due Process Clause does not necessarily prohibit the State from employing this presumption as it was construed by the state court, *if* respondent would purge his contempt judgment by paying off his arrearage. In these circumstances, the proper course for this Court is to vacate the judgment below and remand for further consideration of § 1209.5 free from the compulsion of an erroneous view of fed-

---

[12] It is also perhaps of some significance, though not binding upon us, that the parties reinforce the ambiguity on this point by entitling this contempt order, in the Joint Appendix, as "Order of the Superior Court of the State of California, County of Orange, to Purge Arrearage and Judgment of Contempt." App. i.

eral law. See, *e. g., Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.,* 467 U. S. 138, 152 (1984). If on remand it is found that respondent would purge his sentence by paying his arrearage, then this proceeding is civil in nature and there was no need for the state court to reinterpret its statute to avoid conflict with the Due Process Clause.[13]

We therefore vacate the judgment below and remand for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

This case concerns a contempt proceeding against a parent who repeatedly failed to comply with a valid court order to make child support payments. In my view, the proceeding is civil as a matter of federal law. Therefore, the Due Process Clause of the Fourteenth Amendment does not prevent the trial court from applying a legislative presumption that the parent remained capable of complying with the order until the time of the contempt proceeding.

---

[13] Even if this relief is judged on remand to be criminal in nature because it does not allow the contemnor to purge the judgment by satisfying the terms of the prior orders, this result does not impose any real handicap on the States in enforcing the terms of their orders, for it will be clear to the States that the presumption established by § 1209.5 can be imposed, consistent with the Due Process Clause, in any proceeding where the relief afforded is civil in nature as defined by this Court's precedents. In addition, the state courts remain free to decide for themselves the state-law issues we have taken as having been resolved in this case by the court below, and to judge the lawfulness of statutes that impose similar presumptions under the provisions of their own state constitutions.

I

The facts of this case illustrate how difficult it can be to obtain even modest amounts of child support from a noncustodial parent. Alta Sue Adams married respondent Phillip William Feiock in 1968. The couple resided in California and had three children. In 1973, respondent left the family. Mrs. Feiock filed a petition in the Superior Court of California for the County of Orange seeking dissolution of her marriage, legal custody of the children, and child support. In January 1976, the court entered an interlocutory judgment of dissolution of marriage, awarded custody of the children to Mrs. Feiock, and ordered respondent to pay child support beginning February 1, 1976. The court ordered respondent to pay $35 per child per month for the first four months, and $75 per child per month starting June 1, 1976. The order has never been modified.

After the court entered a final judgment of dissolution of marriage, Mrs. Feiock and the children moved to Ohio. Respondent made child support payments only sporadically and stopped making any payments by December 1982. Pursuant to Ohio's enactment of the Uniform Reciprocal Enforcement of Support Act (URESA), Mrs. Feiock filed a complaint in the Court of Common Pleas of Stark County, Ohio. See Ohio Rev. Code Ann. § 3115.09(B) (1980). The complaint recited that respondent was obliged to pay $225 per month in support, and that respondent was $2,300 in arrears. The Ohio court transmitted the complaint and supporting documents to to the Superior Court of California for the County of Orange, which had jurisdiction over respondent. Petitioner, the Orange County District Attorney, prosecuted the case on behalf of Mrs. Feiock in accordance with California's version of URESA. See Cal. Civ. Proc. Code Ann. § 1670 *et seq.* (West 1982).

After obtaining several continuances, respondent finally appeared at a hearing before the California court on June 22, 1984. Respondent explained that he had recently become a

partner in a flower business that had uncertain prospects. The court ordered respondent to pay $150 per month on a temporary basis, although it did not alter the underlying order. Payments were to begin July 1, 1984.

Respondent made payments only for August and September. Respondent appeared in court three times thereafter, but never asked for a modification of the order. Eventually, the Orange County District Attorney filed Orders to Show Cause and Declarations of Contempt alleging nine counts of contempt based on respondent's failure to make nine of the $150 support payments. At a hearing held August 9, 1985, the District Attorney invoked Cal. Civ. Proc. Code Ann. § 1209.5 (West 1982), which says:

> "When a court of competent jurisdiction makes an order compelling a parent to furnish support . . . for his child, . . . proof that the parent was present in court at the time the order was pronounced and proof of noncompliance therewith shall be prima facie evidence of a contempt of court."

In an effort to overcome this presumption, respondent testified regarding his ability to pay at the time of each alleged act of contempt. The court found that respondent had been able to pay five of the missed payments. Accordingly, the court found respondent in contempt on five of the nine counts and sentenced him to 5 days in jail on each count, to be served consecutively, for a total of 25 days. The court suspended execution of the sentence and placed respondent on three years' informal probation on the conditions that he make monthly support payments of $150 starting immediately and additional payments of $50 per month on the arrearage starting October 1, 1985.

Respondent filed a petition for a writ of habeas corpus in the California Court of Appeal, where he prevailed on his argument that § 1209.5 is unconstitutional as a mandatory presumption shifting to the defendant the burden of proof of an element of a criminal offense. That is the argument that the

Court confronts in this case. In my view, no remand is necessary because the judgment below is incorrect as a matter of federal law.

## II

The California Court of Appeal has erected a substantial obstacle to the enforcement of child support orders. As petitioner vividly describes it, the judgment turns the child support order into "a worthless piece of scrap." Brief for Petitioner 47. The judgment hampers the enforcement of support orders at a time when strengthened enforcement is needed. "The failure of enforcement efforts in this area has become a national scandal. In 1983, only half of custodial parents received the full amount of child support ordered; approximately 26% received some lesser amount, and 24% received nothing at all." Brief for Women's Legal Defense Fund et al. as *Amici Curiae* 26 (footnote omitted). The facts of this case illustrate how easily a reluctant parent can evade a child support obligation. Congress recognized the serious problem of enforcement of child support orders when it enacted the Child Support Enforcement Amendments of 1984, Pub. L. 98–378, 98 Stat. 1305. S. Rep. No. 98–387, pp. 5–6 (1984); H. R. Rep. No. 98–527, pp. 30, 49 (1983). The California Legislature responded to the problem by enacting the presumption described in § 1209.5. Now, says petitioner, the California Court of Appeal has sabotaged the California Legislature's effort.

Contempt proceedings often will be useless if the parent seeking enforcement of valid support orders must prove that the obligor can comply with the court order. The custodial parent will typically lack access to the financial and employment records needed to sustain the burden imposed by the decision below, especially where the noncustodial parent is self-employed, as is the case here. Serious consequences follow from the California Court of Appeal's decision to invalidate California's statutory presumption that a parent contin-

ues to be able to pay the child support previously determined to be within his or her means.

Petitioner asks us to determine as a matter of California law that inability to comply with a support order is an affirmative defense to a contempt charge, so that the burden of persuasion may be placed on the contemnor under *Martin* v. *Ohio,* 480 U. S. 228 (1987). Petitioner also contends that the Court of Appeal erred in supposing that § 1209.5 shifts the burden of persuasion rather than merely the burden of production, citing *Lyons* v. *Municipal Court,* 75 Cal. App. 3d 829, 838, 142 Cal. Rptr. 449, 452 (1977); *Oliver* v. *Superior Court,* 197 Cal. App. 2d 237, 242, 17 Cal. Rptr. 474, 476–477 (1961); 4A J. Goddard, California Practice: Family Law Practice § 686 (3d ed. 1981); 14 Cal. Jur. 3d, Contempt §§ 32, 71 (1974); and 6 B. Witkin, Summary of California Law, Parent and Child § 137 (8th ed. 1974). But the interpretation of California law is the province of California courts. I agree with the majority that, for purposes of this decision, we should assume that the California Court of Appeal correctly determined these matters of state law. *Martin* v. *Ohio, supra; United Gas Public Service Co.* v. *Texas,* 303 U. S. 123, 139 (1938). If the Court of Appeal was in error, the California courts may correct it in future cases.

The linchpin of the Court of Appeal's opinion is its determination that the contempt proceeding against respondent was criminal in nature. The court applied what it understood are the federal due process standards for mandatory evidentiary presumptions in criminal cases. See *Ulster County Court* v. *Allen,* 442 U. S. 140, 167 (1979) (mandatory presumptions are impermissible unless "the fact proved is sufficient to support the inference of guilt beyond a reasonable doubt"); *Sandstrom* v. *Montana,* 442 U. S. 510, 523–524 (1979). This Court has recognized, by contrast, that civil contempt proceedings do not require proof beyond a reasonable doubt and that the rules governing use of presumptions differ accordingly. In the civil contempt context, we have

upheld a rule that shifts to the contemnor the burden of production on ability to comply, *United States* v. *Rylander*, 460 U. S. 752, 757 (1983), and we have recognized that the contemnor may bear the burden of persuasion on this issue as well, *Maggio* v. *Zeitz*, 333 U. S. 56, 75–76 (1948). If the contempt proceeding in this case may be characterized as civil in nature, as petitioner urges, then under our precedents the presumption provided in Cal. Civ. Proc. Code Ann. § 1209.5 (West 1982) would not violate the Due Process Clause.

The characterization of a state proceeding as civil or criminal for the purpose of applying the Due Process Clause of the Fourteenth Amendment is itself a question of federal law. *Allen* v. *Illinois*, 478 U. S. 364 (1986). The substance of particular contempt proceedings determines whether they are civil or criminal, regardless of the label attached by the court conducting the proceedings. See *Shillitani* v. *United States*, 384 U. S. 364, 368–370 (1966); *Penfield Co.* v. *SEC*, 330 U. S. 585, 590 (1947); *Nye* v. *United States*, 313 U. S. 33, 42–43 (1941); *Lamb* v. *Cramer*, 285 U. S. 217, 220–221 (1932); *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 441–443 (1911). Civil contempt proceedings are primarily coercive; criminal contempt proceedings are punitive. As the Court explained in *Gompers:* "The distinction between refusing to do an act commanded,—remedied by imprisonment until the party performs the required act; and doing an act forbidden,—punished by imprisonment for a definite term; is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment." 221 U. S., at 443. Failure to pay alimony is an example of the type of act cognizable in an action for civil contempt. *Id.*, at 442.

Whether a particular contempt proceeding is civil or criminal can be inferred from objective features of the proceeding and the sanction imposed. The most important indication is whether the judgment inures to the benefit of another party to the proceeding. A fine payable to the complaining party

and proportioned to the complainant's loss is compensatory and civil. *United States* v. *Mine Workers*, 330 U. S. 258, 304 (1947). Because the compensatory purpose limits the amount of the fine, the contemnor is not exposed to a risk of punitive sanctions that would make criminal safeguards necessary. By contrast, a fixed fine payable to the court is punitive and criminal in character.

An analogous distinction can be drawn between types of sentences of incarceration. Commitment to jail or prison for a fixed term usually operates as a punitive sanction because it confers no advantage on the other party. *Gompers, supra,* at 449. But if a contemnor is incarcerated until he or she complies with a court order, the sanction is civil. Although the imprisonment does not compensate the adverse party directly, it is designed to obtain compliance with a court order made in that party's favor. "When the [contemnors] carry 'the keys of their prison in their own pockets,' the action 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.'" *Shillitani, supra,* at 368 (citations omitted).

## III

Several peculiar features of California's contempt law make it difficult to determine whether the proceeding in this case was civil or criminal. All contempt proceedings in California courts are governed by the same procedural rules. Cal. Civ. Proc. Code Ann. §§ 1209–1222 (West 1982 and Supp. 1988); *In re Morris,* 194 Cal. 63, 67, 227 P. 914, 915 (1924); Wright, Byrne, Haakh, Westbrook, & Wheat, Civil and Criminal Contempt in the Federal Courts, 17 F. R. D. 167, 180 (1955). Because state law provides that defendants in civil contempt proceedings are entitled to most of the protections guaranteed to ordinary criminal defendants, the California courts have held that civil contempt proceedings are quasi-criminal under state law. See, *e. g., Ross* v. *Superior Court,* 19 Cal. 3d 899, 913, 569 P. 2d 727, 736 (1977);

*Culver City* v. *Superior Court*, 38 Cal. 2d 535, 541–542, 241 P. 2d 258, 261–262 (1952); *In re Martin*, 71 Cal. App. 3d 472, 480, 139 Cal. Rptr. 451, 455–456 (1977). Therefore, indications that the California Superior Court conducted respondent's hearing as a criminal proceeding do not conclusively demonstrate for purposes of federal due process analysis that respondent was tried for criminal contempt.

Certain formal aspects of the proceeding below raise the possibility that it involved criminal contempt. The orders to show cause stated that "[a] contempt proceeding is criminal in nature" and that a violation would subject the respondent to "possible penalties." App. 18, 21. The orders advised respondent of his right to an attorney. *Ibid.* During the hearing, the trial judge told respondent that he had a constitutional right not to testify. *Id.*, at 27. Finally, the judge imposed a determinate sentence of five days in jail for each count of contempt, to be served consecutively. See Cal. Civ. Proc. Code Ann. § 1218 (West 1982) (contempt may be punished by a fine not exceeding $500, or imprisonment not exceeding five days, or both); cf. Cal. Civ. Proc. Code Ann. § 1219 (West 1982) (contempt may be punished by imprisonment until an act is performed, if the contempt is the omission to perform the act).

Nevertheless, the substance of the proceeding below and the conditions on which the sentence was suspended reveal that the proceeding was civil in nature. Mrs. Feiock initiated the underlying action in order to obtain enforcement of the child support order for the benefit of the Feiock children. The California District Attorney conducted the case under a provision of the URESA that authorizes him to act on Mrs. Feiock's behalf. Cal. Civ. Proc. Code Ann. § 1680 (West 1982). As the very caption of the case in this Court indicates, the District Attorney is acting on behalf of Mrs. Feiock, not as the representative of the State of California in a criminal prosecution. Both of the provisions of California's

enactment of the URESA that authorize contempt proceedings appear in a chapter of the Code of Civil Procedure entitled "Civil Enforcement." *Id.*, §§ 1672, 1685. It appears that most States enforce child and spousal support orders through civil proceedings like this one, in which the burden of persuasion is shifted to the defendant to show inability to comply. J. Atkinson, Modern Child Custody Practice 556 (1986); H. Krause, Child Support in America 65 (1981); Annot., 53 A. L. R. 2d 591, 607–616 (1957 and Supp. 1987).

These indications that the proceeding was civil are confirmed by the character of the sanction imposed on respondent. The California Superior Court sentenced respondent to a fixed term of 25 days in jail. Without more, this sanction would be punitive and appropriate for a criminal contempt. But the court suspended the determinate sentence and placed respondent on three years' informal probation on the conditions that he comply with the support order in the future and begin to pay on the arrearage that he had accumulated in the past. App. 40. These special conditions aim exclusively at enforcing compliance with the existing child support order.

Our precedents indicate that such a conditional sentence is coercive rather than punitive. Thus in *Gompers*, we observed that civil contempt may be punished by an order that "the defendant stand committed *unless* and until he performs the affirmative act required by the court's order." 221 U. S., at 442 (emphasis added). In *Shillitani*, we decided that civil contempt could be punished by a prison sentence fixed at two years if it included a proviso that the contemnor would be released as soon as he complied with the court order. 384 U. S., at 365. In this case, if respondent performs his obligations under the original court order, he can avoid going to jail at all. Like the sentence in *Shillitani*, respondent's prison sentence is coercive rather than punitive because it effectively "conditions release upon the contemnor's willingness to [comply]." *Id.*, at 370.

It is true that the order imposing the sentence does not expressly provide that, *if* respondent is someday incarcerated and *if* he subsequently complies, he will be released immediately. The parties disagree about what will happen if this contingency arises, Tr. of Oral Arg. 44, 45–47, and there is no need to address today the question whether the failure to grant immediate release would render the sanction criminal. In the case before us respondent carries something even better than the "keys to the prison" in his own pocket: as long as he meets the conditions of his informal probation, he will never enter the jail.

It is critical that the only conditions placed on respondent's probation, apart from the requirement that he conduct himself generally in accordance with the law, are that he cure his past failures to comply with the support order and that he continue to comply in the future.* The sanction imposed on respondent is unlike ordinary criminal probation because it is collateral to a civil proceeding initiated by a private party, and respondent's sentence is suspended on the condition that he comply with a court order entered for the benefit of that party. This distinguishes respondent's sentence from suspended criminal sentences imposed outside the contempt context.

This Court traditionally has inquired into the substance of contempt proceedings to determine whether they are civil or criminal, paying particular attention to whether the sanction

---

*Unlike the Court, *ante*, at 638–641, I find no ambiguity in the court's sentencing order that hints that respondent can purge his jail sentence by paying off the arrearage alone. The sentencing order suspends execution of the jail sentence and places respondent on probation on the conditions that he *both* make future support payments at $150 per month *and* pay $50 per month on the arrearage. App. 40. If respondent pays off the arrearage before the end of his probation period, but then fails to make a current support payment, the suspension will be revoked and he will go to jail. See *People* v. *Chagolla*, 151 Cal. App. 3d 1045, 199 Cal. Rptr. 181 (1984) (explaining that if a court suspends a sentence on conditions, and any condition is violated, the court *must* reinstate the original sentence).

imposed will benefit another party to the proceeding. In this case, the California Superior Court suspended respondent's sentence on the condition that he bring himself into compliance with a court order providing support for his children, represented in the proceeding by petitioner. I conclude that the proceeding in this case should be characterized as one for civil contempt, and I would reverse the judgment below.