OPINION
GARY P. SULLIVAN, Chief Justice.

BRIEF FACTUAL OVERVIEW AND PROCEDURAL HISTORY

On August 5, 1998, Marion Dale (Dale) entered a plea of guilty to a charge of burglary. Dale was represented by Clayton Reum, (Reum) who is a duly licensed Lay Advocate admitted to practice before the Fort Peck Tribal Court. Following his plea, Dale was held in custody pending a sentencing hearing. On August 6, 1998, Reum successfully petitioned the Court for Dale’s release for the sole purpose of attending Dale’s father’s funeral. In a written order filed on August 6, 1998, the Court scheduled a sentencing hearing to be held on August 14, 1998 at 9:00 a. m. and released Dale to the custody of Reum and Dale’s mother, Doris Lambert[1] for the purpose of attending the funeral.
At the sentencing hearing on August 14, 1998, the Tribal Prosecutor, Chris Many Deeds, questioned whether Dale had, in fact, attended his father’s funeral. It was then disclosed that Dale had not attended the funeral. At that point this exchange took place:
Many Deeds: Your Honor, I’d like to request a direct contempt of court. The intent of that release was that the defendant should go to the funeral. And if he was. not able to attend, he should have informed the court and turned himself back in. This was not a (general) release.
Judge Dupuis: And as I recall, we were waiting on the defendant’s counsel to submit the order before his release. And he was advised of that in the morning.
Many Deeds: That’s right.
Judge Dupuis: As counsel for him, do you have anything to say on his behalf? ... (Page 18, line 20 through Page 19, line 17, Court transcript, 8/14/98) (Further discussion between the Court and Mr. Reum followed.)
[[Image here]]
Judge Dupuis: But the whole issue behind the Court’s order and the release was for him to attend his father’s funeral. It is, more or less, a mockery of this Court. You say you’re going to do something and then, you don’t follow *206 through on it. ... (id. at Page 20, lines 16 through 20)
[[Image here]]
Clayton Reum: ... I didn’t know there was a special responsibility to make sure that he actually left here and went to his father’s funeral. I didn’t have that responsibility.
Judge Dupuis: But that was the whole reasoning behind the release, Mr. Reum. Clayton Reum: Well ... okay ... I can’t .. .
Judge Dupuis: And I fault you, also, because you should have made the Court aware of this.
Clayton Reum: I did make the Court aware of it.
Judge Dupuis: You did not tell us that he did not go. This is the first that I’ve heard of it. Today! I did not know that he was ... not back in jail. I did not know that he did not go to his father’s funeral. That was the whole purpose of the release. I had a big problem with releasing him on a felony. The whole purpose behind the release for him to attend his father’s funeral. And then, I come to Court, today, and I find out that he didn’t even go to his father’s funeral. Clayton Reum; Is it within my power or authority to make sure that he gets on ... his mother said that he was leaving at 6:30. I mean ... I can’t sit there and watch him ...
Judge Dupuis: But as his Counsel, you took on that responsibility. That was (one of) the conditions of the release. That’s like a slap in the face to this Court system. It’s like you just ... I just can’t ...
Clayton Reum: Well, I can say, Your Honor, there was no intent to be contemptuous to this Court on my part. I acted ... everything I tried to do ... I tried to do and keep the Court informed and be honest about what I’m doing. There was no intent to deceive this Court. I was not of the understanding that it was my personal responsibility that he left here and went there. I was only here to represent his interest, which was appealed to the Court for his release so he can attend the funeral. If he doesn’t go ... I don’t know what I can do about it. I mean, there’s so much that a Counsel can be responsible for.
Many Deeds: Your Honor, I guess I’d like to know if the Counsel did know if he didn’t go and when he knew when he didn’t go?
Clayton Reum: No, I didn’t know that he didn’t go.
Judge Dupuis: When did you know he didn’t go?
Clayton Reum: Probably ... (extended pause) .. . when was he released? The 7th?
Many Deeds: Yes.
Clayton Reum: I think ... probably the 11th.
Many Deeds: Your Honor, then the defense Counsel has violated diligence and fairness to opposing party and honesty towards the Court, under the Code of Ethics.
Judge Dupuis: For the direct contempt of Court, Mr. Dale gets another five (5) days flat. And for his Counsel, for not informing the Court of all this happening, he gets fined one hundred dollar ($100) fine before he can practice in this Court. Court’s adjourned.
Reum requests that this Court review Judge Dupuis’ order of contempt, alleging that he was denied due process of law, that the Judge was biased toward him and that the Judge’s bias is clearly shown by her failure to hold other Court officials (osten *207 sibly Doris Lambert, defendant’s mother) in contempt.

STANDA1W OF REVIEW

“The jurisdiction of the Court of Appeals shall extend to all appeals from final orders and judgments of the Tribal Court. The Court of Appeals shall review de novo all determinations of the Tribal Court on matters of law, but shall not set aside any factual determinations of the Tribal Court if such determinations are supported by substantial evidence”. Title I, CCOJ § 201. Whether our Tribal Court has afforded a defendant “due process of law” is a question of law, thus we review the matter de novo.

DISCUSSION

It has been said that, “(f)ew legal concepts have bedeviled courts, judges, lawyers and legal commentators more than contempt of court”[2]. This most likely results from the fact that contempt must be evaluated in one of two separate contexts, “criminal” and “civil” and. in the criminal context the analysis must go further to determine whether the contempt was “direct” or “indirect”. Further complicating the issue is the fact that both of these areas can overlap, making analysis even more difficult.
Title III § 410 of the Fort Peck Comprehensive Code of Justice (CCOJ) grants authority to our Tribal Courts to punish for criminal contempt:
Sec. 410. Criminal contempt.
All courts of the Assiniboine and Sioux Tribes have power to punish for contempt of their' authority the following offenses:
(a) misbehavior of any person in its presence or so near- thereto as to obstruct the administration of justice; or
(b) disobedience or resistance to any process, order, subpoena, warrant or' command of the Court.
Criminal contempt is a Class A misdemeanor.
There are no specific references in the CCOJ to civil contempt per se. The only references to any contempt apart from § 410 deal with punishment for failure to obey a subpoena (Title IV §§ 106 & 504; & Title XI § 607(c)), failure to pay a fine imposed by the Court (Title II § 601), failure to pay court ordered child support (Title VI § 304b), administrative enforcement of the Fort Peck Underground Storage Tank Code (Title XXII § 116). Many, if not all, of these references specify “criminal contempt”.
In as much as our CCOJ defines only “criminal contempt” and does not offer guidance in distinguishing between civil and criminal contempt, we look to Federal authority (Title IV § 501[3])
Federal courts’ contempt power is regulated by statute and rule. 18 U.S.C. § 401[4]; Rule 42[5], Federal Rules of Crimi *208 nal Procedure; see United States v. Wilson, 421 U.S. 309, 315 n. 6, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975) (Rule 42 applies the contempt power defined in section § 401). § 401 recognizes two types of contempt: direct and indirect. Our Title III CCOJ § 410 closely parallels § 401.
We note at the outset that the first tier of the analysis, distinguishing between criminal and civil contempt, is no mere formality. In general terms, civil contempt is coercive in nature, forcing action (e.g. compelling a witness to testify; compelling disclosure of some kind) or it may be remedial and thus used to vindicate or protect the rights of a litigant. Civil contempt does not exist to punish the contem-nor or to vindicate the court’s integrity; it exists as a remedial sanction to be used to obtain compliance with the court’s order or to compensate for damages sustained as a result of noncompliance. Morgan v. Barry, 596 F.Supp. 897 (D.D.C.1984).
On the other hand, “criminal contempt is a crime in the ordinary sense”, (Bloom, v. Illinois, 391 U.S. 194, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)) and “criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings,” (Hicks v. Feiock, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988)).
The main question in determining whether the contempt is civil or criminal concerns the primary purpose of the contempt order in the first instance. As shown above, if the order was made to coerce action, or if it was remedial in nature, that is to protect or vindicate the rights of one of the litigants, then the contempt is civil. If the purpose of the order is to punish the contemnor and/or to vindicate the integrity of the court, then the contempt is criminal.
It is clear that the Tribal Court intended to punish Dale (five (5) days flat jail time) for his failure to attend his father’s funeral after having been released for that specific purpose. Likewise, it is clear that the Tribal Court was vindicating the dignity and integrity of the Court when it fined Reum for his failure to notify the Court of Dale’s failure to attend the funeral. (“It is, more or less, a mockery of this Court. You say you’re going to do something and then, you don’t follow through on it ...” Court transcript at Page 20, lines 16 through 20). Thus, in *209 both instances the contempt cited was criminal.
After determining the contempt to be criminal, the next step is to distinguish whether the contempt was “direct” or “indirect”. This part of the analysis is important because the procedural rights of the defendant may vary depending upon the physical location of the contemptuous behavior.
In the simplest terms, “direct” contempt is misbehavior in the courtroom or in the “presence of the court”, (see Title III CCOJ § 410(a) and 18 USC § 401(1)), while indirect criminal contempt usually involves disobedience of a judge’s order outside of the courtroom (see id. § 410(b) and § 401(3)). What constitutes in the “presence of the court” is often controversial. In the Matter of Heathcock, et. al., 696 F.2d 1362, 1364 (11th Cir.1983).
It is obvious that Dale’s failure to attend the funeral took place “outside the presence of the court”. Therefore, he was entitled to notice and an opportunity to be heard, along with various other constitutionally mandated procedural rights. (See Hicks, supra) The summary proceeding on Dale’s contempt charge denied him due process of law.
Reum’s contempt presents a more difficult analysis. At first glance it would appear that the “bottom line” for Reum’s contempt is the same as Dale’s, inasmuch as both contempt charges arose from the same facts (i.e. Dale’s failure to attend the funeral). However, Dale was cited because he failed to attend the funeral (an act that took place outside the presence of the Court), while Reum was cited for his failure to inform the Court of Dale’s conduct. Dale was released to attend his father’s funeral on August 6, 1998. Reum’s next scheduled Court appearance on Dale’s matter was August 14, 1999, the same day that he was charged and found in contempt. It could be argued that his first opportunity to notify the Court was August 14, 1998, therefore Reum’s failure took place at the commencement of the hearing on August 14, 1998 and thus, his failure ivas “in the presence of the Court”. This argument would analogize Reum’s failure to notify the Court to an attorney’s failure to appear in Court at a previously noticed time and date.
However, we think the better argument is that Reum’s failure to notify took place at the first opportunity to notify the Court after he learned that Dale did not attend the funeral. In other words, did Reum have an opportunity to notify the court prior to August 14th? At the August 14th hearing, the Prosecutor asked when Reum knew that Dale did not go to the funeral (see Court Transcript quoted above) and Reum replied, “... the 11th”. We take judicial notice that August 11, 1998, was a Tuesday. August 14, 1998, was a Friday. Reum had two full Court days, plus whatever portion of the 11th, to notify the Court. Even so, to pinpoint the exact time and place of Reum’s failure is really an exercise in futility, tantamount to proving a “negative”. Nonetheless, we conclude that Reum’s failure to notify the Court took place sometime prior1 to August 14th.
Thus, we hold that Reum’s failure to notify the Court was an act “outside the presence of the Court” and further1, it was not the kind of conduct contemplated by direct contempt (i.e. “misbehavior in the Courtroom”). Accordingly, we find that Reum was entitled to notice and air opportunity to be heard on the contempt charge.
The summary proceedings wherein both Dale and Reum were held and convicted for “direct contempt” denied each of there defendants due process of law. Accordingly, both the contempt charge against Dale *210 and the contempt charge against Reum are reversed.
CONCUR: GARY M. BEAUDRY, Associate Justice, CARROLL J. DeCOTEAU, Associate Justice.

. While we note from the record that Doris Lambert is a Fort Peck Tribal Prosecutor, that fact is not relevant to our proceedings.

. Martineau, Contempt of Court: Eliminating the Confusion between Civil and Criminal Contempt, 50 U. Cin. L.Rev. 677 (1981)

. Sec. 501. Applicable laws.h
In determining any case over which it has jurisdiction, the Court shall give binding effect to:
(a) any applicable constitutional provision, treaty, law, or any valid regulation of the United States;
[[Image here]]

.§401. Power of court
A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none others, as—
(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) Misbehavior of any of its officers in their official transactions;
*208 Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

. Rule 42. Criminal Contempt
(a) Summary disposition. A criminal contempt may be punished summarily if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.
(b) Disposition upon notice and hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. The defendant is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant’s consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.